**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-cv-61749-AHS**

GILMER BAUTISTA, GILMER'S
ENTERPRISE LLC, JUAN MENDOZA,
HILDA MENDOZA, ALEJANDRO DIAZ
and TYLER WITTER on behalf of
themselves and all others similarly situated,

     Plaintiffs,                                   **CLASS ACTION**

vs.

WELLS FARGO BANK, N.A.,

     Defendant.

_____/

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Gilmer Bautista, Gilmer's Enterprise LLC, Juan Mendoza, Hilda Mendoza, Alejandro Diaz and Tyler Witter (together, "Plaintiffs"), bring this Amended Complaint individually and on behalf of all others similarly situated, against Wells Fargo Bank N.A. ("Wells Fargo"), and allege as follows:

**INTRODUCTION**

1.     This is an action against Wells Fargo for aiding and abetting a massive Ponzi scheme orchestrated by Johanna Garcia ("Garcia") and Pavel Ruiz ("Ruiz") through MJ Capital Funding, LLC ("MJ Capital") and MJ Taxes and More Inc. ("MJ Taxes") (together, the "MJ Conspirators"). Using a uniform investor agreement, the MJ Conspirators misrepresented to investors that the MJ Conspirators would use investor funds to make merchant cash advances ("MCAs") to small businesses. The MJ Conspirators told investors they would receive high

monthly returns from merchant loan repayments and interest received, with investors' principal investments guaranteed by the MJ Conspirators.

2.      In reality, the MJ Conspirators used accounts at Wells Fargo to operate a classic Ponzi scheme.  The MJ Conspirators paid returns to investors using new investor money, raising as much as $200 million from more than 5,500 investors before the Securities and Exchange Commission ("SEC") filed an action and obtained temporary restraining orders freezing assets of the MJ Conspirators. The district court appointed Corali Lopez-Castro as receiver for MJ Capital and MJ Taxes (the "Receiver"). *See SEC v. MJ Capital Funding LLC*, No. 0:21-cv-61644-AHS (S.D. Fla.) (Singhal, J.).

3.      Wells Fargo knew of and substantially assisted the MJ Conspirators' scheme.  The MJ Conspirators used payment apps like Venmo, Cash and Zelle to receive and send payments to investors.  These payment apps have gained notoriety as vehicles of fraud and scams, in large part due to their opacity and speed. Wells Fargo's own anti-money laundering ("AML") and internal policies prohibited the linking of these digital cash transactions to business accounts such as the MJ Conspirators' corporate accounts.

4.      Acting within the scope of her duties, the manager of Wells Fargo's Palm Aire branch, "WELLS FARGO EMPLOYEE 1," helped the MJ Conspirators get around the bank's AML and internal restrictions.  WELLS FARGO EMPLOYEE 1 and her assistant manager "WELLS FARGO EMPLOYEE 2" guided the MJ Conspirators through a coordinated series of withdrawals and deposits involving Garcia's personal and MJ Capital and MJ Taxes accounts. These transactions made hundreds of third-party transactions that normally would have triggered the bank's AML and internal policy monitors appear as unrelated larger deposits and withdrawals. These transactions allowed money derived from electronic payment applications, or "cash

payment apps," to move unhindered to and from the MJ Conspirators' corporate accounts, beyond detection or review of the bank's AML or internal policy monitors. They also allowed the MJ Conspirators to move investors' money out of MJ Capital and to MJ Taxes, where it was used to pay referral sources, including WELLS FARGO EMPLOYEE 1.

5.    Indeed, WELLS FARGO EMPLOYEE 1, and her family members, received payments from the MJ Capital Conspirators in connection with the Ponzi Scheme. Further, WELLS FARGO EMPLOYEE 1 referred numerous investors to the MJ Conspirators, receiving incredibly high referral fees of 10% per investment in return.

6.    The MJ Conspirators delivered payments to WELLS FARGO EMPLOYEE 1 while she was working at the bank and, according to one witness, on at least one occasion one of the MJ Capital Conspirators referenced WELLS FARGO EMPLOYEE 1 as being able to solve any banking issues at Wells Fargo.

7.    WELLS FARGO EMPLOYEE 1 knew the MJ Conspirators were perpetrating a fraud. WELLS FARGO EMPLOYEE 1 knew that the MJ Conspirators operated out of a small office in a strip mall just five blocks from Wells Fargo's Palm Aire branch. WELLS FARGO EMPLOYEE 1 knew they were soliciting tens of millions of dollars *each month* from unsophisticated investors at incredible speed. WELLS FARGO EMPLOYEE 1 also knew that the MJ Conspirators were paying investors extraordinary monthly returns of 10% to 15% and further paying referral sources like herself significant commissions. And WELLS FARGO EMPLOYEE 1 understood the MJ Conspirators' fraudulently represented business model—making merchant cash advances to small businesses—and knew that this business model was false. Knowing all of this, WELLS FARGO EMPLOYEE 1 helped the MJ Conspirators avoid the bank's AML and

internal policies for digital cash transactions and allowed the MJ Conspirators to perpetrate the fraud.

8.      Upon information and belief, the MJ Conspirators' account activity at the Palm Aire branch would have been amongst the most, if not the most, high-volume and high-value transactions and deposits at the branch for a substantial period of time with a number of recurring and frequent visits from MJ Conspirators, associated characters and victims.

9.      Given WELLS FARGO EMPLOYEE 1's knowledge of the MJ Conspirators' business, business model and its payment structure to investors and referral sources, WELLS FARGO EMPLOYEE 1 also knew that the MJ Conspirators had a fiduciary relationship with investors.  She knew that investors like those she referred to the MJ Conspirators were unsophisticated investors who put their trust, confidence and reliance on the MJ Conspirators to (i) take their money, (ii) securely invest it into MCAs that would generate the promised returns and then (iii) distribute the agreed-upon proceeds.

10.     Furthermore, WELLS FARGO EMPLOYEE 1's knowledge—and WELLS FARGO EMPLOYEE 1's and WELLS FARGO EMPLOYEE 2's assistance with avoiding the bank's cash payment app prohibitions—can be imputed to Wells Fargo. Their efforts to help the MJ Conspirators conduct violative banking activities were performed within the scope of their duties as Wells Fargo branch manager and assistant manager.  They occurred at the Palm Aire branch, during working hours and as part of the scope of their normal job duties—helping clients withdraw and deposit money.

11.     Moreover, their efforts did not solely benefit WELLS FARGO EMPLOYEE 1. They unquestionably benefited the bank as well.  In less than a year, Wells Fargo received tens of millions of dollars in deposits that generated significant fees and other income to the bank.  Indeed,

Wells Fargo publicly reported on July 14, 2021, that for the second quarter of 2021, its return on assets was 1.25%. MJ Capital raised from investors an estimated $200 million, tens of millions of which was deposited with Wells Fargo, earning it substantial fees and income.

12. Evidence of Wells Fargo's knowledge of the scheme is further bolstered by its "Know Your Customer" inquiries into the MJ Conspirators. From the time of opening the MJ Conspirators' accounts, Wells Fargo knew that the MJ Conspirators were supposed to use investor monies to lend to small merchants, which would then repay the loans, the proceeds of which would be used to pay back investors. Wells Fargo monitored the MJ Conspirators' accounts and saw that very little money going in and out of the MJ Conspirators' accounts came from or went to merchants. Instead, Wells Fargo saw investor funds commingled in the MJ Capital account, large sums being transferred from that account to Garcia's personal account, and similarly large sums being transferred from Garcia's personal account to the (non-investment) MJ Taxes account, where thousands of checks were cut to referral sources like WELLS FARGO EMPLOYEE 1.

13. Indeed, upon information and belief, no later than April 2021, Wells Fargo was aware that federal law enforcement was investigating the MJ Conspirators.

14. Despite this knowledge, Wells Fargo substantially assisted the MJ Conspirators by allowing them to continue operating with Wells Fargo accounts, commingle investor funds and make payments via wire, transfer and check. Garcia and the MJ Conspirators' banking activities at Wells Fargo were integral to the scheme to defraud investors.

## PARTIES

### A. Plaintiffs

15. Plaintiff Gilmer's Enterprise LLC ("Gilmer LLC") is a Florida limited liability company based in Broward County, Florida. Gilmer Bautista ("Bautista") is Gilmer LLC's sole

manager and member.  Bautista is a resident and citizen of the state of Florida, and resides in Broward County, Florida. Bautista created Gilmer LLC for the sole purpose of entering into an MCA with MJ Capital.  Bautista funded the payments made to MJ Capital and is a real party in interest to this lawsuit.

16.     Plaintiff Juan Mendoza ("Mr. Mendoza") is a resident and citizen of the state of Florida, who resides in Miami-Dade County, Florida.

17.     Plaintiff Hilda Mendoza ("Ms. Mendoza") is a resident and citizen of the state of Florida, who resides in Miami-Dade County, Florida.

18.     Plaintiff Alejandro Diaz ("Diaz") is a resident and citizen of the state of Florida, who resides in Miami-Dade County, Florida.

19.     Plaintiff Tyler Witter ("Witter") is a resident and citizen of the state of Florida, who resides in Broward County, Florida.

**B.  Defendant**

20.     Defendant Wells Fargo is a nationally chartered bank headquartered in Sioux Falls, South Dakota, and conducts its business nationwide, including in Florida. Wells Fargo provided banking services in Florida to Garcia individually and MJ Capital and MJ Taxes in Florida.

**C.  Relevant Non-Parties**

21.     MJ Capital is a Florida limited liability company formed by Johanna Garcia in June 2020.  Its principal place of business was at 2754 West Atlantic Boulevard in Pompano Beach, Florida.

22.     MJ Taxes is a Florida limited liability company formed by Johanna Garcia in 2016.  Its principal place of business was in Pompano Beach, Florida, in the same office as MJ Capital.

23.     Johanna Garcia is a resident of Broward County, Florida.  With Ruiz, she controlled the MJ Conspirators.  She was the manager, president and an authorized member of MJ Capital.  She was the president of MJ Taxes.

24.     Pavel Ruiz is a resident of Broward County, Florida.  He was a "board member" of MJ Capital and, with Garcia, controlled the MJ Conspirators.

25.     WELLS FARGO EMPLOYEE 1 is upon information and belief a resident of Broward County, Florida.

26.     WELLS FARGO EMPLOYEE 2 is upon information and belief a resident of Palm Beach County, Florida.

27.     Additional and unknown co-conspirators joined and assisted the MJ Conspirators' fraud.

**JURISDICTION & VENUE**

28.     <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, Title 28, United States Code, Section 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Class who are citizens of different states than Defendant Wells Fargo; and (iii) there are in the aggregate more than 100 members of the proposed class.

29.     <u>Personal Jurisdiction</u>. This Court has specific personal jurisdiction over Wells Fargo pursuant to Rule 4(k)(1)(a) and Section 48.193(1)(a) (2021), Florida Statute, because the causes of action alleged arise from Wells Fargo's tortious acts within Florida, its engaging in

business in Florida, and causing injury to persons or property within Florida while engaged in business in Florida.

30.    <u>Venue</u>. Venue is proper in this forum pursuant to Title 28, United States Code, Section 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this District, and because Defendant would be subject to personal jurisdiction with respect to this action in this District if this District were a separate state.

## ADDITIONAL FACTUAL BACKGROUND

### A.  The MCA Investment Scheme

31.    From at least June 2020 and continuing through the present, the MJ Conspirators raised almost $200 million from more than 5,500 investors across the United States (but mostly in South Florida) through a fraudulent investment scheme.

32.    To raise money from their victims, the MJ Conspirators falsely represented to investors and prospective investors that their funds would be used to fund small business loans called Merchant Cash Advances ("MCAs").  In exchange, the MJ Conspirators promised victims they would receive highly monthly returns of typically 10% per month (120% annually), along with the return of their principal.

33.    The MJ Conspirators (and WELLS FARGO EMPLOYEE 1, among others) solicited and raised money from investors by way of various means, including the websites and social media accounts for MJ Capital and MJ Taxes, their employees, external sales agents and word-of-mouth. Whatever the form of solicitation, the message was uniform: that MJ Capital would use the investor's money to fund MCAs.  MJ Capital would lend the money to small business merchants, then use those borrowers' repayments to repay the investor with monthly interest and ultimately the investor's principal.

34.     The MJ Conspirators entered into standardized, uniform agreements with each victim (the "Investor Agreement").  The Investor Agreement referred to the investor as the "Purchaser," and provided that the investor's money would be used to fund an MCA.  The Investor Agreement promised investors a high annual return, typically 120%.  The term of each investment was either six months; nine months; 12 months; or six months with an option by the investor to extend the term for an additional six months.

35.     The MJ Conspirators knew at the time they made the representations contained in the Investor Agreements that they were false. The MJ Conspirators failed to use investor funds to finance merchant cash advances to small businesses as promised to investors. Instead, in classic Ponzi-scheme fashion Garcia and the MJ Conspirators steered investor funds to pay returns to other investors, made cash withdrawals from investor funds and misspent investor funds on sales agent commissions and loan repayments benefitting MJ Taxes.

36.     According to the SEC, the MJ Conspirators filed no liens in connection with the purported MCAs.  And according to the Receiver, the MJ Conspirators appear to have faked or forged some or all of their agreements with merchants.

37.     According to the SEC, for the period June 1, 2020, through April 30, 2021, the MJ Conspirators received up to $200 million in investor funds from investors in Florida and several other states.  However, the SEC alleges that the MJ Conspirators made no more than $3 million in payments to MCA recipients, if any, and likely much less than that.

38.     Because the MJ Conspirators made few, if any, MCAs and were diverting substantial investor money, the MJ Conspirators were not earning anywhere near the revenue needed to pay the promised returns to investors.

39.     According to the SEC, from June 1, 2020, through April 30, 2021, the MJ Conspirators paid between $20 million and $29.3 million in purported returns to victims. However, instead of paying investors out of the revenue of the business, the MJ Conspirators used new investor money to pay returns to existing investors — a classic Ponzi scheme.

40.     Contrary to the representations to victims, the investments in the MJ Conspirators were not secure.  The only way the MJ Conspirators could honor their obligations to investors would be through the successful continuation of their fraudulent scheme.  Once the supply of new victims was exhausted, the MJ Conspirators would be unable to pay the promised returns to existing investors.

41.     As a result of MJ Conspirators' uniform misrepresentations within the Investor Agreements, Plaintiffs and investors each reasonably believed their investments were used to fund MCAs and were relatively safe.  Had they known about the misrepresentations and omissions, they would not have invested.

**B. The MJ Conspirators Had Fiduciary Duties to Plaintiffs and the Other Investors**

42.     The MJ Conspirators, and particularly MJ Capital, Garcia and Ruiz, had a duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship. Specifically, these MJ Conspirators had a duty to take Plaintiffs' and class members' money and use it to advance cash to small business merchants, and to collect repayments from those merchants and deliver the money to Plaintiffs and class members according to a set payment schedule:

> The Parties acknowledge that the Purchaser is advancing cash to the Merchant *through [MJ Capital Funding]* in order to purchase a portion of the Merchant's future receivables—a portion that will be delivered to the Purchaser by the Merchant *through [MJ Capital Funding]* by following the fixed payment schedule laid above.

(Investor Agreement § 4 (emphasis added)).

43.     In addition, these MJ Conspirators fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

44.     These MJ Conspirators knew that investors, including Class Plaintiffs and class members, were relying on and trusting them to properly invest their hard-earned money.  The investors, most if not all of whom were unsophisticated investors, were vulnerable.  They relied on and trusted these MJ Conspirators, and these MJ Conspirators knew and encouraged that reliance and trust.

45.     Indeed, as part of the Investor Agreements, MJ Capital guaranteed to repay investors' principal if the merchant defaulted: "Parties have also agreed that in this event [of default by the Merchant], MJCF will have 45 calendar days to deliver an amount equivalent to the Order Payment to the Purchaser."  (Investor Agreement § 7).

46.     MJ Capital also required investors, including Class Plaintiffs and class members, to sign Confidentiality Agreements promising not to disclose information about MJ Capital.

**C.  Wells Fargo Knew About and Substantially Assisted the Fraudulent Scheme**

47.     Beginning in mid-2020, the MJ Conspirators used Wells Fargo as the primary bank to operate the Ponzi scheme. MJ Capital and MJ Taxes each held an account at Wells Fargo. Garcia also held two individual accounts at Wells Fargo.

**1.  WELLS FARGO EMPLOYEES 1 and 2 Help Garcia Avoid AML and Internal Monitors**

48.     Garcia opened the MJ Capital and MJ Taxes accounts and her personal accounts at Wells Fargo's Palm Aire branch, which is located at 2200 West Atlantic Boulevard in Pompano Beach, Florida.

49.     Soon after their opening, the accounts became some of the largest accounts originated at the branch, with millions of dollars running through them each month.

50.     WELLS FARGO EMPLOYEE 1 was the Palm Aire branch's manager throughout the relevant period.  WELLS FARGO EMPLOYEE 2 was one of the branch's assistant managers.

51.     The MJ Conspirators' scheme included the use of third-party electronic payment applications such as Venmo, Cash, PayPal and Zelle.  These cash payment apps allowed the MJ Conspirators to quickly obtain investments from investors, deposit them into a commingled bank account and send payments back out to other investors or the MJ Conspirators' principals.

52.     Cash payment apps have been repeatedly cited in recent years as a vehicle for fraud and scams because of the speed at which cash payments can be made and, just as importantly, because the identities of those sending or receiving payments through these apps are opaque and/or easily obfuscated.

53.     For this reason, as part of its AML and internal policies, Wells Fargo prohibited the use of cash payment apps into and out of business accounts such as the MJ Conspirators' accounts.

54.     Shortly after the MJ Conspirators' accounts were opened at the branch, WELLS FARGO EMPLOYEE 1 explained these bank policies to Garcia — but also offered Garcia a way around them.  WELLS FARGO EMPLOYEE 1 advised Garcia to tell investors to send payment app payments to a personal account at Wells Fargo, where they could then be aggregated and transferred to the MJ Conspirators' accounts.

55.     Garcia and the MJ Conspirators did just that.  For example, just within the first week of April 2021, Garcia's personal account received 56 cash payment app deposits totaling more than $86,000.

56.     WELLS FARGO EMPLOYEE 1 and assistant manager WELLS FARGO EMPLOYEE 2 also guided Garcia and the MJ Conspirators through a coordinated series of cash withdrawals and deposits involving Garcia's personal and corporate accounts that allowed referral sources — including WELLS FARGO EMPLOYEE 1 — to be paid from the MJ Taxes account rather than the MJ Capital account. At encounters with Garcia in the Palm Aire branch, WELLS FARGO EMPLOYEE 1 and WELLS FARGO EMPLOYEE 2 processed large, aggregated cash withdrawals of investor funds from the MJ Capital account. That cash was immediately deposited into Garcia's personal account.

57.     For example, on April 1, 2021, WELLS FARGO EMPLOYEE 1 and/or WELLS FARGO EMPLOYEE 2 helped Garcia withdraw $315,076.64 from the MJ Capital account. Simultaneously, they processed a deposit in the exact same amount — $315,076.64 — into Garcia's personal account. These transactions ensured that there would be no direct transfers of investor money out of the MJ Capital account and into Garcia's personal account that would trigger the bank's AML and internal alarms.

58.     The processing of cash withdrawals and deposits falls within the scope of WELLS FARGO EMPLOYEE 1's and WELLS FARGO EMPLOYEE 2's duties at the bank.

**2. Account Activity Is Inconsistent With Wells Fargo's Know Your Customer Information**

59.     Federal law requires banks to "know their customers" and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

60.     Customer due diligence requires Wells Fargo to identify its customers, report indications of suspicious activity and assign a "customer risk rating."  Customer due diligence requires Wells Fargo to know what business the customer is in, and to understand the types of transactions a customer should, and actually does, make. When monitoring its customers' accounts, Wells Fargo is obligated to comply with the Bank Secrecy Act (BSA), including regulations broadening its anti-money laundering provisions. The BSA requires Wells Fargo to develop, administer and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

61.     Wells Fargo must also maintain a customer due diligence program to predict the types of transactions, dollar volume and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

62.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

63.     Wells Fargo and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual. These include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round-dollar amounts; (7) payments unconnected to legitimate contracts or revenue sources; (8) fund transfers containing limited content or related party information; and, (9) an unusually large number of persons or entities receiving fund transfers from one company.

64.     Here, Wells Fargo engaged in a Know Your Customer analysis of the MJ Conspirators and monitored the MJ Conspirators' accounts for anomalous or suspicious behavior. Wells Fargo collected and reviewed information about MJ Capital's business operations, the source of its funds and the purpose of its accounts.

65.     Wells Fargo knows that merchant cash advance frauds have proliferated nationwide in recent years and have been the subject of multiple enforcement actions.

66.     Further, Wells Fargo knows what its employees know, including WELLS FARGO EMPLOYEES 1 and 2.

67.     Wells Fargo understood MJ Capital's claimed business model: to raise money from investors and use it to make MCAs to generate money to repay investors.  Wells Fargo, therefore, should have seen banking activity consistent with this business model. That is, MJ Capital's banking activity should have reflected its receipt of investor funds, use of those funds make loans to borrowers, receipt of interest payments from borrowers, and use of those funds to pay returns

to investors.  But that was not what Wells Fargo saw.  Instead, it saw a great deal of investor money entering the MJ Capital account—and an array of other banking activities blatantly at odds with the MJ Conspirators' claimed business model.

68.     Importantly, Wells Fargo knew that MJ Capital's accounts received *investor* funds. Indeed, according to the SEC's forensic accountant, the MJ Conspirators deposited tens of millions of dollars from thousands of separate payors.  Upon information and belief, many of those deposits featured transaction memos that specifically notified Wells Fargo of the purpose of the payment as "investment," "Merchant cash advance," "contract," or similar terminology.

69.     Wells Fargo knew generally that merchant cash advance frauds have proliferated nationwide in recent years and have been the subject of multiple enforcement actions. Additionally, the deposits from investors and withdrawals out of the MJ Capital accounts were mostly round numbers, drawn on accounts of many different individuals and entities in Florida and across the country, which were followed by similar, round-number payments to those individuals or their affiliated entities.

70.     As a further example of banking activity that conflicted with MJ Capital's business model, one would expect to see a regular flow of interest payments from merchant borrowers reflected in MJ Capital's bank accounts.  According to the SEC, however, the accounts took in only minimal cash from actual borrowers.  Wells Fargo processed the incoming interest payments and knew that only a limited number of borrowers were making interest payments to MJ Capital and those interest payments did not come close to matching MJ Capital's committed outlays and purported business operations.

71.     The SEC examined the MJ Conspirators' bank account records (the same records available to Wells Fargo) and concluded that the transactional activity in the accounts was not

consistent with their purported business models. Indeed, only a small portion (1%) of investor funds was used to make MCAs.

72.     The SEC concluded that MJ Capital used at least $20 million (or 32%), and possibly another $9.3 million, to pay investors what appear to be interest and principal payments. Only $588,561 (or 1%) of the withdrawals appeared to be payments to MCA recipients—and in a recent Interim Report the Receiver suggested that many if not all purported merchant agreements are fakes or forgeries. Thus, instead of using the funds to provide MCAs as promised, Garcia and the MJ Conspirators used the majority of investor funds to make interest and principal payments to other investors in classic Ponzi fashion. Additionally, Defendants diverted investor funds to pay commissions to sales agents promoting investment in the MJ Conspirators and to repay loans owed by MJ Taxes. Garcia also misappropriated investor assets through cash withdrawals.

73.     The loan agreements and MCA agreements are investment contracts. Investors looked solely to the MJ Conspirators to produce returns, and the MJ Conspirators' ability to do so depended entirely on their ability to either fund profitable MCAs or attract new investors to cover payments to existing investors. The bank knew or willfully ignored that MJ was raising considerable investor funds from multiple small investors but was not properly registered to sell securities or qualify for any exemption for the sale of securities.

74.     Despite this knowledge of fraud, Wells Fargo failed to timely act upon the accounts connected with the Garcia and MJ Conspirators. Wells Fargo continued to accept deposits of investor money and carry out the transfers needed to consummate the fraud.

75.     Wells Fargo's actions and inaction were integral to the scheme to defraud investors. It was through Wells Fargo account transactions that the MJ Conspirators applied new investor

funds to pay existing investor returns, made cash withdrawals on investor funds and misspent investor funds on sales agent commissions and MJ Taxes loan repayments.

76.     The MJ Conspirators could not have carried out the scheme without first raising a large amount of funds from investors and then depositing and transferring those funds among bank accounts. The MJ Conspirators' use of Wells Fargo accounts to commingle investor money enabled them to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments with interest earned from bona fide MCAs.

77.     According to the SEC, the flow of funds in the MJ Conspirators' bank accounts shows that the funds used to pay investors their principal and interest were derived primarily from other investors' deposits, and it is "obvious that the MJ Conspirators' purported MCA business is really just a front for a growing Ponzi scheme."

78.     Had WELLS FARGO EMPLOYEE 1 and Wells Fargo not knowingly and substantially assisted the scheme from its inception, and/or had closed the MJ Conspirators' accounts at Wells Fargo early on, none of the Plaintiffs or other class members would have suffered damages.

79.     Wells Fargo benefitted from the MJ Conspirators' and Garcia's continued use of their accounts, which generated significant fees and the use of millions of dollars in deposits.  For example, in April 2021 alone MJ Capital ran more than $19 million through its account at Wells Fargo and generated thousands of dollars in fees.

**3.  Wells Fargo Knew About the Fiduciary Duty Owed to the Investor Victims**

80.     Wells Fargo knew that the MJ Conspirators, and particularly MJ Capital, Garcia and Ruiz, owed fiduciary duties to victims.

81.     Wells Fargo, through WELLS FARGO EMPLOYEE 1 and WELLS FARGO EMPLOYEE 2, and through the bank's Know Your Customer inquiries, knew that these MJ Conspirators had a duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship.  These MJ Conspirators had a duty to take Plaintiffs' and class members' money and use it to advance cash to small business merchants, and to collect repayments from those merchants and deliver the money to Plaintiffs and class members in accordance with the Investor Agreements.

82.     Wells Fargo also knew, through WELLS FARGO EMPLOYEE 1 and WELLS FARGO EMPLOYEE 2, that investors were relying on and trusting these MJ Conspirators to properly invest their money, and that the investors were unsophisticated and vulnerable.

**D.  Victims Included Class Plaintiffs**

83.     Plaintiff Gilmer Bautista, 30, works as an IT help desk consultant for the non-profit Cross Catholic Outreach in Boca Raton, Florida, where he earns $55,000 annually.  On June 28, 2021, Bautista attended a Zoom conference hosted by MJ Capital with at least 100 other potential investors.

84.     The MJ Capital representative told him that if Bautista invested, MJ Capital would put those dollars to work in the form of merchant loans to small businesses. Those merchant loans would then be used to pay him 10% per month on his investment.  MJ Capital did not allow any questions.

85.     Bautista opened up an LLC, Plaintiff Gilmer LLC, and was presented with a Merchant Cash Advance Agreement reflecting the MJ Capital representative's statements at the conference.  It included a detailed payment schedule in which MJ Capital promised to pay him

10% monthly returns.  Convinced that he was investing in a legitimate MCA agreement, Bautista signed the Agreement and invested $1,000.

86.     A month later, on July 30, 2021, MJ Capital paid Bautista $100, his initial 10% monthly return.  Encouraged, on August 9 Bautista decided to invest his life savings of $45,000. That same day, the SEC filed a civil complaint for injunctive and other relief against MJ Capital, alleging that Garcia ran a "classic Ponzi scheme." Two days later, the district court in the SEC case appointed a receiver over MJ Capital and MJ Taxes.

87.     Plaintiffs Mr. and Ms. Mendoza are residents and citizens of the state of Florida. Mr. and Ms. Mendoza reside in Miami-Dade County, Florida.

88.     As adolescents, Mr. and Ms. Mendoza fled Cuba with their families to escape the communist Castro regime. In 1980, they met in Miami, where they married and raised three children.

89.     Mr. Mendoza is a retired post office worker. At 18, he joined the U.S Army and was honorably discharged two years later. In 1978, he joined the United States Post Office, where he worked until his retirement in 2015. For the last 25 years, Ms. Mendoza has worked as a Property Manager for various real estate companies.

90.     In March 2021, Mr. and Ms. Mendoza attended a Zoom conference hosted by MJ Capital representatives. The MJ Capital representatives said that if the Mendozas invested, MJ Capital would use those funds to extend merchant loans to small businesses.  The interest on those merchant loans would then be used to pay a 10% monthly return on their investment.  MJ Capital did not allow any questions.

91.     On March 11, 2021, Mr. Mendoza was presented with a Merchant Cash Advance Agreement and a detailed payment schedule in which MJ Capital promised to pay him 10%

monthly returns.  Convinced that he was investing in a legitimate MCA agreement, Mr. Mendoza signed the Agreement on March and invested $50,000.

92.     Over the next three months, Mr. Mendoza received the first three monthly installments, each 10% of his $50,000 investment.  MJ Capital gave Mendoza the opportunity to roll over his initial investment and invest more, which he did.  On June 17, 2021, Mr. Mendoza invested an additional $20,000, bringing his total investment up to $70,000.

93.     In April 2021, Ms. Mendoza was presented with a Merchant Cash Advance Agreement and a detailed payment schedule in which MJ Capital promised to pay her 10% monthly returns.  Convinced that she was investing in a legitimate MCA agreement, she withdrew from her 401k retirement account, signed the Agreement and invested $18,000 with MJ Capital. She received her first three monthly payments and then reinvested an additional $4,000 in July 2021, bringing her total investment up to $22,000.  Ms. Mendoza completed her last investment via Zelle, which was paid directly to the MJ Conspirators' personal bank account.

94.     <u>Plaintiff Alejandro Diaz</u>, 38, is a licensed physical therapist.

95.     On or about March of 2021, Diaz attended a Zoom conference hosted by MJ Capital representatives.  The MJ Capital representatives presented a convincing narrative that if Diaz invested, MJ Capital would use those funds to extend merchant cash loans to small businesses. The interest on those merchant loans would then be used to pay him a 10% monthly return on his investment.

96.     Shortly thereafter, Diaz was presented with a Merchant Cash Advance Agreement and a detailed payment schedule in which MJ Capital promised to pay him 10% monthly returns. Convinced that he was investing in a legitimate MCA agreement, Diaz signed the Agreement and invested $35,000.

97.     From April 2021 through June 2021, Diaz received his first monthly installments equal to 10% of his investment, or $3,500.  When his Agreement was up for renewal in June, Diaz signed a second Agreement and invest more funds.  In June 2021, Diaz invested an additional $60,000, bringing his total investment up to $95,000.

98.     Plaintiff Tyler Witter, 25, works for a physician staffing firm in Coconut Creek, Florida.  Witter recently graduated from Florida Atlantic University with a degree in Health Administration.  After graduating, he worked for a local hospital as a patient specialist, earning $14 an hour.  While pursuing his degree at FAU, he worked for a pest control company and used his income to pay for his education.

99.     Witter heard about MJ Capital through word-of-mouth while at his barbershop.  He then visited MJ Capital's social media accounts and visited the MJ Capital office.  There, the MJ Capital sales agent told Witter that if he invested, MJ Capital would put those dollars to work in the form of merchant loans to small businesses.  The agent presented Witter with the Merchant Cash Advance Agreement and a detailed payment schedule in which he was promised 10% monthly returns.

100.    Believing that the 10% monthly returns would be a good way to help pay for college, Witter signed up and invested $2,500 on or about August 2020.  Witter renewed his contract with MJ Capital twice, each time adding another $2,500.  The MJ Conspirators advised Witter to make his investment via Zelle because it was easier to process.  Witter followed instructions and completed his last investment of $2,500 via Zelle to the MJ Conspirators' personal bank account at Wells Fargo.

### E.  SEC Enforcement

101.    On August 9, 2021, the SEC filed a civil complaint for injunctive and other relief in the Southern District of Florida against Garcia, MJ Capital and MJ Taxes. The complaint charges that Garcia ran a "classic Ponzi scheme," commingled investor funds, paid existing investors with money garnered from new investors, and misappropriated millions of dollars.

102.    The SEC alleged that the MJ Conspirators' business model was a sham—instead of paying investor returns with payments obtained from legitimate MCAs, the MJ Conspirators and Garcia aggressively raised funds from new investors and used those incoming funds to pay old investor returns.

103.    The district court acted immediately on the SEC's emergency *ex parte* motions for a temporary restraining order and for appointment of a receiver, granting the motions on August 11, 2021.  The SEC court found "The Court also finds good cause to believe that unless immediately restrained and enjoined by Order of this Court, Defendants will continue to dissipate, conceal or transfer from the jurisdiction of this Court assets which could be subject to an Order of Disgorgement."

## CLASS ACTION ALLEGATIONS

104.    <u>Main Class</u>.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed class of all persons who signed an MCA with MJ Capital, invested money and suffered damages.

      a.    <u>Florida Subclass</u>.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated Florida residents and/or citizens as members of the proposed class of all persons who signed an MCA with MJ Capital, invested money and suffered damages.

105.    Excluded from the classes are Wells Fargo and its employees, the Relevant Non-Parties and their employees, as well as the Judge to whom the Action is assigned and any member of the Judge's staff and immediate family.

106.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1)-(4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

107.    <u>Numerosity</u>.  The members of the Classes are so numerous that joinder of all members is impracticable.  More than 5,500 people signed an MCA with MJ Capital and invested money in MJ Capital.

108.    <u>Commonality</u>.  There are numerous questions of fact or law that are common to Plaintiffs and all the members of the Class.  Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to the following:

        (a)    Whether Garcia and the MJ Conspirators committed fraud;

        (b)    Whether Garcia and the MJ Conspirators had a fiduciary duty to Plaintiffs and members of the class;

        (c)    Whether Garcia and the MJ Conspirators breached that fiduciary duty to Plaintiffs and members of the class;

        (d)    Whether Wells Fargo had actual knowledge of the scheme;

        (e)    Whether Wells Fargo, despite actual knowledge of the scheme, substantially assisted it;

(f)     Whether WELLS FARGO EMPLOYEE 1's and WELLS FARGO EMPLOYEE 2's actions, inaction and/or knowledge may be imputed to Wells Fargo; and

(g)     Whether Class Plaintiffs and class members suffered damages.

109.   <u>Typicality</u>. Plaintiffs have claims that are typical of the claims of all of the members of the Class.  Plaintiffs and each class member invested in MJ Capital and were subject to the wrongful conduct alleged in this complaint.  Furthermore, the claims arise under legal theories that apply to Plaintiffs and all other class members.

110.   <u>Adequacy of Representation</u>.  Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Plaintiffs do not have claims that are unique to Plaintiffs and not the other class members, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the claims of the Class.  Further, Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

111.   <u>Predominance</u>.  Common questions of law and fact predominate over questions affecting only individual class members. The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

112.   <u>Superiority</u>.  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.  The damages sought by Plaintiffs and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute the claims.

113.   <u>Manageability</u>.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

114.   <u>Ascertainability</u>.  Class members are readily ascertainable.  The class members are identifiable from information and records in the possession, custody or control of Wells Fargo or the Relevant Non-Parties, as well as the appointed Receiver.

115.   All conditions precedent to this action have occurred or have been waived.

**COUNT 1**
**Aiding and Abetting Fraud**

116.   Plaintiffs re-allege and incorporate paragraphs 1 through 41, 47 through 80 and 84 through 116 above as if fully set forth herein.

117.   As set forth above, the MJ Conspirators perpetrated a fraud upon Plaintiffs and class members through materially false and misleading statements and omissions that misled Plaintiffs and class members to believe they were investing in MCAs.  The MJ Conspirators knew these statements to be false.  Among other fraudulent conduct, The MJ Conspirators:

    a.    through a uniform set of agreements, falsely told inventors that their investments would be used to fund MCAs;

    b.    falsely promised high monthly returns on their investments;

    c.    falsely promised that the MJ Conspirators would guarantee repayment of principal if the merchant defaulted;

    d.    concealed from investors that they were operating a Ponzi scheme by, among other unlawful acts, commingling investor funds and paying earlier investors with funds obtained from later investors; and

e.    concealed from investors that the MJ Conspirators misappropriated and misused millions of investor funds for improper purposes.

118.    Plaintiffs and class members reasonably relied to their detriment upon those misrepresentations when they invested with the MJ Conspirators.

119.    Wells Fargo substantially assisted the MJ Conspirators, with knowledge that they were defrauding consumers like Class Plaintiffs and class members.  In connection with providing substantial and material assistance to the MJ Conspirators, Wells Fargo knew of its role in their scheme, and acted knowingly in assisting.

120.    Wells Fargo substantially benefited from their participation in the scheme, earning substantial fees from the MJ Conspirators' accounts.

121.    As a direct and proximate result of Wells Fargo aiding and abetting the fraud, Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Wells Fargo for their damages; pre- and post-judgment interest; punitive damages; and such other and further relief as the Court deems just and proper.

**COUNT 2**
**Aiding and Abetting Breach of Fiduciary Duty**

122.    Plaintiffs re-allege and incorporate paragraphs 1 through 116 above as if fully set forth herein.

123.    The MJ Conspirators, particularly MJ Capital, Garcia and Ruiz, fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.  They had a duty to act for the benefit of Class Plaintiffs and class members upon matters within the scope of their relationship, which included the duty to take

Plaintiff's and class members' money and use it to advance cash to small business merchants, and to collect repayments from those merchants and deliver money to Plaintiffs and class members.

124.     These MJ Conspirators breached their fiduciary duties by perpetrating a scheme that misled Plaintiffs and class members to believe they were investing in MCAs, by misappropriating, commingling and otherwise misusing investor funds, and otherwise acting as alleged herein in violation of his fiduciary duties to investors.

125.     Wells Fargo, through WELLS FARGO EMPLOYEE 1 and WELLS FARGO EMPLOYEE 2, and through the bank's Know Your Customer inquiries, knew that these MJ Conspirators, including MJ Capital and Garcia, owed fiduciary duties to investors, including Plaintiffs and the class.

126.     Wells Fargo substantially assisted in the breaches of fiduciary duty with knowledge that these MJ Conspirators were breaching those duties.

127.     As a direct and proximate result of Wells Fargo's aiding and abetting these MJ Conspirators' breaches of fiduciary duty, Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Wells Fargo for their damages, including but not limited to profits made by Wells Fargo relating to the MJ Conspirators, their principals or employees; pre- and post-judgment interest; punitive damages; and such other and further relief as the Court deems just and proper.

**COUNT 3**
**Unjust Enrichment**

128.     Plaintiffs re-allege and incorporate paragraphs 1 through 116 above as if fully set forth herein.

129.     Wells Fargo provided banking services to the MJ Conspirators through various bank accounts.  Those bank accounts were used to carry out the Ponzi scheme.

130.     The funds held in the MJ Conspirators accounts belonged to investors.  Thus, Plaintiffs and class members conferred benefits upon Wells Fargo in the form of deposits from which Wells Fargo generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees.  Wells Fargo knowingly and voluntarily accepted, and retained, the deposits and those benefits.

131.     Because Wells Fargo aided and abetted the MJ Companies' fraud and breach of fiduciary duty, it would be inequitable for Wells Fargo to retain the benefits it generated from monies of Class Plaintiffs and class members.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Wells Fargo for the return of income and fees retained by Wells Fargo; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 4
### Negligence

132.     Plaintiffs re-allege and incorporate paragraphs 1 through 116 above as if fully set forth herein.

133.     A fiduciary relationship existed between MJ Capital on the one hand and investors like Plaintiffs and class members on the other hand.

134.     Wells Fargo knew or should have known of this fiduciary relationship.

135.     Wells Fargo had actual knowledge that its accountholders the MJ Conspirators were misappropriating Plaintiffs' and class members' funds.

136.     Wells Fargo therefore had a duty of care to Plaintiffs and class members.

137.     Wells Fargo breached that duty of care by continuing to allow the MJ Conspirators to conduct banking services with the bank and failing to close their accounts.

138.     Because of and as a result of that breach, Plaintiffs and class members suffered damages.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Wells Fargo for their damages, including but not limited to profits made by Wells Fargo relating to the MJ Conspirators, their principals or employees; pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

CASE NO. 21-cv-61749-AHS

Dated:  December 13, 2021                    Respectfully submitted,

| | |
|---|---|
| **LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**<br><br>By: /s/Jason Kellogg<br>    Jeffrey C. Schneider, P.A.<br>    Florida Bar No. 933244<br>    Primary email: jcs@lklsg.com<br>    Secondary email: gb@lklsg.com<br>    Jason K. Kellogg, P.A.<br>    Florida Bar No. 0578401<br>    Primary email: jk@lklsg.com<br>    Secondary email: gb@lklsg.com<br>    Victoria J. Wilson, Esq.<br>    Florida Bar No. 92157<br>    Primary email: vjw@lklsg.com<br>    Secondary email: acd@lklsg.com<br>    201 South Biscayne Boulevard<br>    Citigroup Center, 22nd Floor<br>    Miami, Florida  33131<br>    Telephone: (305) 403-8788<br>    Facsimile: (305) 403-8789<br><br>**SILVER LAW GROUP**<br><br>By: /s/Scott L. Silver<br>    Scott L. Silver, Esq.<br>    Florida Bar No. 095631<br>    Primary email: ssilver@silverlaw.com<br>    Secondary email: rfeinberg@silverlaw.com<br>    Ryan A. Schwamm, Esq.<br>    Florida Bar No. 1019116<br>    Primary email: rschwamm@silverlaw.com<br>    11780 W. Sample Road<br>    Coral Springs, Florida 33065<br>    Telephone: (954) 755-4799<br>    Facsimile: (954) 755-4684 | **COLSON HICKS EIDSON**<br><br>By: /s/ Francisco R. Maderal<br>    Curtis B. Miner.<br>    Florida Bar No. 885681<br>    Email: curt@colson.com<br>    Francisco R. Maderal<br>    Florida Bar No. 41481<br>    Email: frank@colson.com<br>    255 Alhambra Circle Suite, Penthouse<br>    Coral Gables, Florida 33134<br>    Telephone: (305) 476-7400<br><br><br>**SONN LAW GROUP**<br><br>By: /s/Jeffrey R. Sonn<br>    Florida Bar No. 773514<br>    Primary email: jeff@sonnlaw.com<br>    19495 Biscayne Boulevard<br>    Suite 607<br>    Aventura, Florida  33180-2320<br><br>**SALLAH ASTARITA & COX, LLC**<br><br>By: /s/James D. Sallah<br>    James D. Sallah, Esq.<br>    Fla. Bar. No. 92584<br>    jds@sallahlaw.com<br>    Jeffrey L. Cox, Esq.<br>    Fla. Bar. No. 0173479<br>    jlc@sallahlaw.com<br>    3010 N. Military Trail, Ste. 210<br>    Boca Raton, FL  33431<br>    561-989-9080 (Tel)<br>    561-989-9020 (Fax) |