UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:21-cv-61749-SINGHAL

GILMER BAUTISTA, *et al.*,

    Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

    Defendant.

_____

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND FOR AWARD OF
ATTORNEYS' FEES AND REIMBURSMENT OF EXPENSES**

    Plaintiffs Gilmer Bautista, Gilmer's Enterprise LLC, Juan Mendoza, Alejandro Diaz, and Tyler Witter ("Plaintiffs"), for themselves and the Settlement Class Members, move for (i) final approval of the Settlement[1] of this Action against Defendant Wells Fargo Bank, N.A. ("Defendant"); and (ii) an award of attorneys' fees to Class Counsel and reimbursement of expenses advanced by Class Counsel to prosecute the Action.

**I.    INTRODUCTION**

    On August 9, 2021, the U.S. Securities and Exchange Commission ("SEC") filed a lawsuit against MJ Capital Funding, LLC, MJ Taxes and More Inc., and Johanna M. Garcia (collectively, the "MJ Capital Co-Conspirators") alleging Mrs. Garcia orchestrated a Ponzi scheme using the companies that misled investors into believing they were funding loans to small businesses with promises of high monthly returns. In reality, the MJ Capital Co-Conspirators paid these returns using new investor money. *See S.E.C. v. MJ Capital Funding, et al.*, No. 21-cv-61644-

---

[1]    All capitalized terms shall have the meanings set forth in the parties' Settlement Agreement, which was attached the Motion for Preliminary Approval as Exhibit 1 [D.E. 67-1] (and which, when cited below, will be referred to as the "SA").

SINGHAL/VALLE (S.D. Fla.). As a result of the SEC's action, this Court appointed Corali Lopez-Castro, Esq. as receiver to take control of the corporate entities (the "Receiver").[2]

On August 20, 2021, Plaintiffs brought this class action against Defendant alleging that they and similarly situated investors were defrauded by the MJ Capital Co-Conspirators. Relevant to this motion, Plaintiffs also alleged that Defendant aided and abetted the MJ Capital Co-Conspirators' fraud by, among other things, serving as MJ Capital's commercial bank. Plaintiffs brought causes of action for aiding and abetting fraud, breach of fiduciary duty, unjust enrichment, and negligence. In December 2021, Plaintiffs filed an amended complaint and Defendant filed a motion to dismiss. The motion has been fully briefed since February 11, 2022. In conjunction with its motion, Defendant sought a stay of discovery, which was granted by this Court. Notwithstanding the stay of discovery, Plaintiffs, through their counsel, worked extensively and diligently to investigate the facts and develop work product in support of their claims.

First, Plaintiffs worked with the Receiver to obtain and analyze records in support of their claims. Second, Plaintiffs communicated with dozens of other potential claimants and potential Plaintiffs in an effort to identify additional alleged co-conspirators and information about the manner and means of the conspiracy that would support Plaintiffs' claims. Third, Plaintiffs hired independent investigators to locate and speak with witnesses with potential knowledge of the conspiracy. Fourth, by agreement and Court order, Plaintiffs obtained thousands of bank records from Wells Fargo and worked, along with the Receiver, to painstakingly reconstruct the flow of funds through the MJ Capital Co-Conspirators fraud and bank accounts for the purpose of mediation.

In May 2022, the Parties participated in mediation with nationally recognized class action mediator Hunter R. Hughes III. Shortly thereafter, the Court appointed the undersigned as interim Class Counsel as negotiations continued. Plaintiffs worked with the mediator and Wells Fargo to

---

[2] Mrs. Lopez-Castro has subsequently been substituted by Bernice Lee, Esq.

exchange necessary records and damage estimates well ahead of a follow-on mediation, which efforts were critical in framing the amounts at issue in a complex fraud and facilitating the proposed resolution. Plaintiffs also worked to keep the Receiver apprised of developments in the litigation and worked to include the Receiver as a party in the ultimate mediation and settlement—another critical key to a successful resolution.

In September 2022, the Parties notified the Court that they had reached a class action settlement through mediation and sought an extension of the stay to allow the Global Parties to further negotiate unresolved terms of the Settlement Agreement. Plaintiffs filed a Motion for Preliminary Approval of the Proposed Class Action Settlement on December 23, 2022 [D.E. 67]. This Court entered an Order Preliminarily Approving Settlement and Providing for Notice on February 28, 2023 [D.E. 69] (the "Preliminary Approval Order").

As directed by the Preliminary Approval Order, Notice of the Settlement was sent to each of the class members using the existing records in the Receiver's possession. Because the Receiver had already conducted a claims process to identify class members as part of the Receivership proceedings, it was not necessary for class members who previously submitted a claim form to re-submit claim forms. However, additional potential class members who did not previously submit a claim form were given the opportunity to do so. The Notice informed class members of the procedures to be followed if they wish to be heard and informs them of their right to opt out or object. A Settlement Website was also created as a portal to obtain information about the Settlement and for class members who have not previously submitted claim forms to do so.

The Receiver caused Notice to be e-mailed to approximately 18,771 potential class members and mailed to approximately 11,332 potential class members. A total of approximately 12,957 timely-filed Claim Forms have been received by the Receiver. (Pursuant to the structure of the Settlement, the Receiver is in the ongoing process of reviewing the timely-filed Claim Forms for issues such as deficiencies in proof, discrepancies in amounts invested or received, and duplication, so the total number of Allowed Claims will presumably be fewer than the total number

of received Claim Forms.) Consistent with the Preliminary Approval Order, an Affidavit or Declaration will be submitted by the Receiver/Settlement Administrator relating to the provision of Notice by June 9, 2023.

The $26.625 million settlement amount represents a significant recovery and provides immediate compensation to the victims. The Settlement will end the litigation and spare the Parties from incurring significant legal fees and expenses. Considering the typical lifespan of complex litigation Consequently, the Parties will avoid expending a significant amount of time and resources to engage in discovery and motion practice and will expedite the recovery of compensation to the victims.

While the Settlement, like any settlement of a civil action, is necessarily a compromise, the path to a greater recovery in this type of case poses significant challenges. With respect to any class certification determination, there is the possibility of appellate review under Rule 23(f). In addition, Plaintiffs would face the usual risks and delays associated with a summary judgment motion before reaching trial (and a jury that may or may not accept Plaintiffs' claims). For these reasons, Plaintiffs and Class Counsel, who have experience in similar litigation, support the Settlement. The Receiver attended mediation and also supports the Settlement because it provides a substantial and important form of otherwise unavailable recovery for the victims. The Receiver separately moved for approval of this Settlement before this Court in the SEC Action, which the Court granted subject to final approval in this matter.

Significantly, despite roughly 30,000 Notices having been sent out by mail and e-mail and nearly 13,000 timely-submitted Claim Forms having been received, **no objections have been received.** That bears repeating: **no objections have been received.** This is a testament to the merits of the Settlement. Equally significant, only seven (7) potential class members indicated that they wished to opt out of the Settlement. And, six (6) of those seven (7) opt-outs appear to represent only four (4) investors who, according to the Receiver's records, did not suffer any financial loss as a result of the MJ Capital scheme. (Some of the investors submitted claims in both their

4

individual name and a corporate name at the same address, thus accounting for the 6 opt-outs.) The one remaining investor did not file a timely Claim Form with the Receiver. Accordingly, there is only **one (1)** (potential) victim investor who chose to opt out of the Settlement—an infinitesimal percentage of the class members. To sum this information tabular form:

| | |
|---|---|
| **Notices Sent** | 30,103 |
| **Claim Forms Received** | 12,957 |
| **Objections** | 0 |
| **Opt-Out Notices** | 7 |
| *Opt-Outs with No Losses* | 6 |
| *Opt-Out with Loss (untimely)* | 1 |

As these results of the Notice process underscore, the Settlement is procedurally and substantively fair, and merits the Court's final approval.

II.     **BACKGROUND AND PROCEDURAL HISTORY**

Plaintiffs' initial complaint was filed on August 20, 2021. [D.E. 1]. On November 1, 2021, Defendant filed its first Motion to Dismiss. [D.E. 17]. On December 13, 2021, Plaintiffs filed an Amended Complaint adding two additional named plaintiffs, substantial additional factual allegations, and a claim for negligence. [D.E. 25]. On January 7, 2022, Defendant filed its second Motion to Dismiss, and moved to stay discovery pending the resolution of its motion to dismiss the amended complaint, which the parties fully briefed. [D.E. 36, 37, 40, 44]. On February 21, 2022, this Court granted the motion to stay discovery. [D.E. 46].

As discussed in the Introduction above, notwithstanding the stay of discovery, Plaintiffs, through their counsel, worked extensively and diligently to investigate the facts, identify witnesses, and develop work product in support of their claims through the summer of 2022.

First, Plaintiffs worked with the Receiver to obtain and analyze records in support of their claims. Second, Plaintiffs communicated with and interviewed dozens other potential claimants and potential Plaintiffs in an effort to identify additional alleged co-conspirators and information

about the manner and means of the conspiracy that would support Plaintiffs' claims. Third, Plaintiffs hired independent investigators to locate and speak with witnesses with potential knowledge of the conspiracy. Fourth, by agreement and Court order, Plaintiffs obtained thousands of bank records from Wells Fargo and worked, along with the Receiver, to painstakingly reconstruct the flow of funds through the MJ Capital Co-Conspirators fraud and Wells Fargo for the purpose of mediation. In addition, Plaintiffs actively monitored parallel federal criminal investigations and ultimate prosecutions of the MJ Capital Conspirators.

The Parties subsequently agreed to mediate before renowned mediator Hunter R. Hughes, III [D.E. 42], and the case was mediated for the first time on May 12, 2022. Though it ended in an impasse, the parties continued arms-length negotiations over the course of several months. As a result of this mediation, Plaintiffs negotiated an Agreed Confidentiality Order and Stipulated Protective Order allowing access to thousands of bank records relevant to the reconstruction of the Ponzi scheme in furtherance of the ongoing negotiations. [D.E. 55-58].

In furtherance of Plaintiffs ongoing negotiations (and ongoing underlying investigation), on May 18, 2022, the Court granted the Parties' Joint Motion to Stay Action through September 2, 2022 and denied Defendant's Motion to Dismiss without prejudice (allowing the Defendant to refile its motion once the stay was lifted). [D.E. 52]. A second formal mediation session was set prior to September 2, 2022. Prior to that date, Plaintiffs informally presented information in support of their allegations obtained through their ongoing investigative efforts.

After months of investigation and two mediations and related negotiations, the parties reached a settlement in the amount of $26.625 million and reported the same to the Court on September 2, 2022. [D.E. 59]. The Court granted an extension of the stay, ultimately through December 16, 2022, allowing the Parties time to complete the further negotiation of the settlement agreement and the drafting and editing of the settlement documents and to submit the instant motion for preliminary approval of the class settlement. [D.E. 62]. After months of work and

additional negotiations, which included the Receiver's counsel, the Parties reached the final Settlement Agreement.

### III.   THE TERMS OF THE SETTLEMENT AGREEMENT

The Parties have agreed to the following settlement terms.

#### A.   The Settlement Class

The proposed Settlement Class is defined as "all persons and entities who invested money in the MJ Capital Scheme and suffered damages."

#### B.   The Settlement Consideration

The Defendant will pay $26.625 million to resolve this class action. No portion of the Settlement Fund will revert to Defendants. (*See* SA § 7.8). Notice and Administrative Expenses will be deducted from the Settlement Fund and paid to the Settlement Administrator. (*See id.* § 7.5). Attorneys' fees and expense reimbursements as approved by the Court will be paid to Class Counsel. (*See id.* §5.1). Pursuant to the Settlement Agreement, Plaintiffs may seek an award not to exceed 24.88% of the class action settlement payment in attorneys' fees, which amount includes reimbursement of litigation expenses and costs. (*See id.*). Settlement was not contingent upon the award of any particular fee. (*See id.* § 5.5). Class Counsel filed their timely Motion for Award of Attorneys' Fees [D.E. 70] on April 10, 2023, requesting that the Court approve an award of attorney's fees and reimbursement of expenses, which two amounts total $6,625,000, which is 24.88% of the $26.625 million Settlement Fund.

The balance, along with any interest accrued on the Settlement Fund, will be applied to pay Distributions to Participating Class Members who are holders of Allowed Claims. Plaintiffs also asked this Court to reserve jurisdiction over the payment of a $3,000 Service Award to each of Plaintiffs (a total of $15,000), pending the potential review of the Eleventh Circuit's opinion in

*Johnson v. NPAS Solutions, LLC*.[3] (*See id.* § 5.8). In the interim, the U.S. Supreme Court declined to review *Johnson*, so there is no need for the Court to address this issue.

Defendant paid $250,000 into escrow following preliminary approval to cover initial costs and expenses for implementing the Settlement and will pay the balance of $26,375,000 upon Final Approval, regardless of any appeal, with all interest accruing to the benefit of the Settlement Class Members. This is a remarkably favorable arrangement for the Settlement Class Members given the interest rate environment, and no attorneys' fees were calculated based on this additional interest payment consideration.

The class release is straightforward, encompassing claims that were or could have been asserted in the case. (*See id.* §§ 1.28, 1.30). The Released Parties, and Releasing Parties are comprised of the Defendant; Settlement Class Members who do not timely opt out of the Settlement; and Class Counsel.

### C. Notice and Administration

Rule 23(c)(2)(B) requires the Court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The Parties have agreed that the Receiver will act as Settlement Administrator. The notification and administration process took into account that the Receiver has already implemented a claims process in the SEC Action pursuant to the Court's Order Granting Receiver's Motion. (SA § 7.2). The Settlement Administrator was responsible for giving and/or supervising Notice to Settlement Class Members, including those Settlement Class Members to whom the Receiver previously provided notice of the claim process in the SEC Action pursuant to the Receiver's Claim Process Order; sending, receiving, reviewing and adjudicating Claim Forms; obtaining new addresses for any returned emails or postal mailings; maintaining

---

[3] In 2020, a panel of the U.S. Court of Appeals for the Eleventh Circuit struck down service awards for lead plaintiffs in class settlements. *See Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020).

records of all activities relating to notice and administration of this Settlement; and other tasks reasonably required to effectuate the administration of the Settlement. (*See id.* § 7). The Settlement Administrator also established a Settlement Website and posted the Notice, Claim Form and related settlement documents on it. (*See id.* § 7.3.2).

Notice of the Settlement was sent directly to Settlement Class Members, including those Settlement Class Members to whom the Receiver previously provided notice of the claim process in the SEC Action pursuant to the Receiver's Claim Process Order, by email, requesting confirmation of receipt. (*See id.* § 7.2.1, 7.3.1). For those Settlement Class Members for which the Settlement Administrator had a mailing address, but did not have an associated email address, and for those whose emails that are undeliverable, Notice was made by postcard via U.S. mail to the most recent mailing address as reflected in the Receiver's records. As noted above, the Receiver caused Notice to be e-mailed to approximately 18,771 potential class members and mailed to approximately 11,332 potential class members. A total of approximately 12,957 timely-filed Claim Forms have been received by the Receiver.

The postcard directed the Settlement Class Members to the Settlement Website. (*See id.*). Each Settlement Class Member had a right to object to the Settlement within 90 days of Preliminary Approval. (*See id.* § 1.21). The requirements for excluding oneself from the Settlement or filing and pursuing an objection were described for Settlement Class Members in the Notice. (*See id.* § 1.19).

The Settlement Administrator shall also be responsible for overseeing the calculation of the Distributions of the Net Consideration to Settlement Class Members. (*See id.* § 7.4). Each Settlement Class Member who timely submits a valid Claim Form and does not opt-out of the Settlement shall be a Participating Settlement Class Member and receive his or her Distribution of the Settlement Fund on a pro rata basis. (*See id.*). The Settlement Administrator shall determine Allowed Claims according to the process set forth in the Receiver's Claim Process Order. (*See id.*).

Finally, the Defendant caused the mailing of CAFA Notice to appropriate officials pursuant to 28 U.S.C. § 1715(b). (*See id.* § 7.11). Pursuant to the Preliminary Approval Order, an Affidavit or Declaration confirming this will be filed by June 16, 2023.

### IV.  THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL.

"There exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (Altonaga, J.) (citations omitted). "Thus, in reviewing a proposed settlement, as here, the Court must take into account 'the clear policy in favor of encouraging settlements, . . . particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals.'" *Id.* (quoting *Patterson v. Newspaper & Mail Deliverers' Union,* 514 F.2d 767, 771 (2d Cir.1975)).

Within this context, a district court's approval of a class action settlement proceeds in two steps. *See Wilson v. Everbank, N.A.*, 2015 WL 10857344, at *1 (S.D. Fla. Aug. 31, 2015). The first step determines whether to conditionally certify a settlement class and notify class members of the pending settlement and a right to participate in a final fairness hearing. *See id.*; *see also* MANUAL FOR COMPLEX LITIG. (FOURTH) §§ 21.622-.623. The second step involves the fairness hearing itself, which occurs only after class members have been notified of their right to participate in the hearing and object to the settlement. *See Wilson*, 2015 WL 10857344, at *1; *Gevaerts v. TD Bank, N.A.*, 2015 WL 12533121, at *10 (S.D. Fla. Aug. 4, 2015).

Final approval requires the Court to evaluate a number of factors. Rule 23 specifies that before finally approving a settlement, the court should consider whether:

> (A)  the class representatives and class counsel have adequately represented the class;
>
> (B)  the proposal was negotiated at arm's length;
>
> (C)  the relief provided for the class is adequate, taking into account:
>
>> (i)  the costs, risks, and delay of trial and appeal;

   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv) any agreement required to be identified under Rule 23(e)(3); and

 (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In exercising its discretion, courts in this Circuit also continue to analyze class action settlements using the so-called *Bennett* factors. *See Ferron v. Kraft Heinz Foods Co.*, 2021 WL 2940240, at *7-*8 (S.D. Fla. July 13, 2021) (analyzing the Rule 23(e) and *Bennett* factors together to approve settlement). The *Bennett* factors consider (i) the likelihood of success at trial; (ii) the range of possible recovery; (iii) the range of possible recovery at which a settlement is fair, adequate and reasonable; (iv) the anticipated complexity, expense and duration of litigation; (v) the opposition to the settlement; and (vi) the stage of proceedings at which the settlement was achieved. *See Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 691 (S.D. Fla. 2014) (citing *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984)).

Here, an analysis of the Rule 23(e)(2) factors and the *Bennett* factors shows that the proposed Settlement is fair, adequate and reasonable, and warrants.

 **A.** **The Adequacy of Representation by Class Representatives and Class Counsel**

Rule 23(e)(2)(A) considers whether the class received adequate representation. Plaintiffs have pursued this litigation vigorously. They actively sought out counsel, monitored the lawsuit throughout its pendency, provided factual information, and provided input on the mediation in an effort to obtain the maximum recovery for both themselves and for the other Settlement Class Members. As for Class Counsel, adequacy is "presumed" absent specific proof to the contrary.

*Diakos*, 137 F. Supp. 3d at 1309. In its Order dated July 25, 2022, this Court appointed the undersigned as interim Class Counsel in this case. [D.E. 58]. Class Counsel are experienced in complex civil litigation and class action litigation and have successfully prosecuted a variety of class actions as well as similar cases throughout the country. There has been no challenge to Class Counsel's adequacy to serve as Class Counsel.

B.       **Whether Negotiations Were Conducted at Arms-Length**

Rule 23(e)(2)(B) looks at whether the parties negotiated an arms-length settlement. "In determining whether there was fraud or collusion, the Court examines whether the settlement was achieved in good faith through arm's-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Berman v. Gen. Motors, LLC*, 2019 WL 6163798, at *4 (S.D. Fla. Nov. 18, 2019) (citations omitted).

There is no hint of collusion here. The Parties attended a full mediation in May 2022 with nationally renowned class action mediator Hunter R. Hughes III. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of Mr. Hughes, a highly experienced mediator, lends further support to the absence of collusion."). Mediation resulted in an impasse; however, the Parties continued negotiating settlement for over three months and eventually advised the Court of a settlement on September 2, 2022, pending the resolution of unresolved terms by the Parties. [D.E. 59].

Furthermore, no portion of the Settlement Fund will revert to Defendant. (*See id.* § 7.8). Although Defendant agrees not to oppose Class Counsel's request for an attorneys' fee award of up to 25%, Settlement is not contingent upon any particular award to Class Counsel. (*See id.* § 5.5).

Relatedly, the sixth *Bennett* factor looks at the stage of litigation at which the parties reached settlement. By the time the Parties reached settlement here, Plaintiffs had undertaken substantial factual investigation, the Receiver and Plaintiffs had engaged in forensic accounting and analysis, and the Parties had been litigating for over a year, briefed a contested motion to dismiss relating to dispositive legal issues, and participated in a months-long mediation process. The Parties were well-positioned to evaluate the benefits of the Settlement Agreement and consider the expense, risks, and uncertainty of continued (and likely protracted) litigation. In sum, the Settlement was negotiated at arm's length, without collusion and at a stage of the litigation where the Parties could make informed decisions as to the risks of litigation and benefits of settlement.

      **C.**      **The Adequacy of Relief Provided by the Settlement**

Rule 23(e)(2)(C) looks at whether the relief provided in the settlement is adequate, taking into account: (i) the costs, risks and delay of trial and appeal; (ii) the effectiveness of distributing relief and processing claims; (iii) the terms of any attorney's fees award, including timing of payment; and (iv) any agreements made in connection with the proposed settlement. Similarly, the first through fifth *Bennett* factors analyze the likelihood of success at trial; the range of possible recovery; the range of possible recovery at which a settlement is fair, adequate and reasonable; the anticipated complexity, expense and duration of litigation; and any opposition to the settlement. *See Saccoccio*, 297 F.R.D. at 691.

Addressing the *Bennett* factors first, in determining whether the Settlement is adequate and fair in comparison to the potential range of recovery, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Berman,* 2019 WL 6163798, at *5 (quoting *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005)). "[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Ferron*, 2021 WL

13

2940240, at *7-8 (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988)). "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id.*

Here, the potential damages that Class Members could be awarded at trial are substantial. The MJ Capital Scheme paid returns to investors using new investor money, raising as much as $200 million from thousands of investors before the SEC filed an action and obtained temporary restraining orders freezing assets of the MJ Capital Receivership Entities, Johanna Garcia, and Pavel Ruiz.

In determining whether a settlement is adequate, the Court may rely at least somewhat upon the judgment of experienced counsel. *See, e.g., Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) ("Absent fraud, collusion, or the like, the district court should be hesitant to substitute its own judgment for that of counsel."). Here, Class Counsel have significant experience in class action and complex fraud litigation, and believe that under these circumstances, and given the particular complexities and challenges in attributing liability to a commercial bank for aiding and abetting a customer's fraud, the $26.625 million in relief provided for by the Settlement is fair, reasonable and adequate under the circumstances.

Significantly, as noted above, despite roughly 30,000 Notices having been sent out by mail and e-mail and nearly 13,000 timely-submitted Claim Forms having been received, <u>no</u> objections have been received. This is a testament to the merits of the Settlement. Equally significant, only seven (7) potential class members indicated that they wished to opt out of the Settlement. And, six (6) of those seven (7) opt-outs appear to represent only four (4) investors who, according to the Receiver's records, did not suffer any financial loss as a result of the MJ Capital scheme. The one remaining investor did not file a timely Claim Form with the Receiver. Accordingly, there is only <u>one</u> (1) (potential) victim investor who chose to opt out of the Settlement—an infinitesimal

percentage of the class members.

### a. The Risks, Costs and Delay of Continued Litigation

The Settlement finds further support from the four specific factors enumerated in new Rule 23(e)(C). Under Rule 23(e)(2)(C)(i), which examines the risks, costs and delay of continued litigation, the Court must "consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Berman*, 2019 WL 6163798, at *6 (quoting *Lipuma*, 406 F. Supp. 2d at 1323). "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations." *Id.* (quoting *Behrens*, 118 F.R.D. at 543).

Here, the potential costs and delay of continued litigation in this case are substantial. The Settlement will bring the action to conclusion without the need for costly and complex discovery. But for the Settlement, the Parties will incur significant additional legal fees and expenses related to that discovery and the inevitable motion practice, in addition to summary judgment proceedings. Any trial of this matter would not likely occur in the near future, particularly given that discovery was stayed before any depositions were taken, written discovery propounded, and documents produced, and any appeals would likely delay a final resolution by an additional year. A trial and final resolution that includes potential Rule 26(f) appeals and appeals from final judgment would likely take years, with a corresponding delay of any benefit to the Class.

Relatedly, the first *Bennett* factor examines the likelihood of success at trial. Here, Plaintiffs believe Defendant's Motion to Dismiss the Amended Complaint will be denied as Plaintiffs sufficiently plead their aiding and abetting fraud and fiduciary duty claims, as well as the unjust enrichment and negligence claims. Plaintiffs do not foresee significant class certification issues. But Defendant will heavily litigate class certification, appeal any class

certification, and have the ability to move to decertify the Class at any time before trial should new factual or legal arguments emerge. Given these circumstances and the fact that a trial victory is rarely a given for any party, the risks attendant to continued litigation supports a settlement now.

### b. The Effectiveness of Distributing Relief to the Class

Rule 23(e)(2)(C)(ii) examines the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Here, the Settlement required the Settlement Administrator to provide direct Notice, first by email and then by direct mail if necessary, to each Settlement Class Member using records held by the Receiver. (SA § 7.3). All Notices directed Settlement Class Members to a Settlement Website containing more information. (*See id.* § 7.3.2). Each Settlement Class Member who timely submitted a Claim Form that is approved by the Settlement Administrator will receive payment.

### c. The Reasonable Terms Relating to Attorneys' Fees

Class Counsel have separately filed Plaintiffs' Motion for Award of Attorneys' Fees and Service Awards [D.E. 70], which sets for their request, and the legal and factual support for their request, in detail. In brief, Rule 23(e)(2)(C)(iii) looks at "the terms of any proposed award of attorney's fees, including timing of payment." Here, Class Counsel may request up to 25% of the $26.625 million. (SA § 5.1). Such a request is consistent with *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), which mandates use of the percentage method and lower than the average fee percentage request. Following *Camden I*, fee awards in the Eleventh Circuit have averaged around one-third. *See Wolff v. Cash 4 Titles*, 2012 WL 5290155, at *5-6 (S.D. Fla. Sept. 26, 2012) ("The average percentage award in the Eleventh Circuit mirrors that of awards nationwide—roughly one-third"); *see also George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) (discussing the normality of 33% contingency fees); Eisenberg, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 (2017) (empirical

study showing the median award in Eleventh Circuit is 33%). Class Counsel have asked the Court for an award of attorney's fees and expenses, to be paid from the Settlement Fund in the amount of 24.88% of the Settlement Fund for fees and reimbursement of expenses, which combined amount is $6,625,000. Given the diligence and experience of Class Counsel (who investigated and developed the claims), the complexity of the issues involved, the substantial amount of time dedicated to the Action and Settlement, and the financial risk associated with the representation, an aggregate fee of this amount would be reasonable here.

### d. Whether There Are Side Agreements

The Parties represent that they have made no agreements in connection with the proposed settlement.

### D. The Equitable Treatment of Class Members Relative to Each Other

Finally, Rule 23(e)(2)(D) analyzes whether the Settlement Agreement treats all members of the Settlement Class equally. Here, the Settlement Agreement treats all members of the Settlement Class equally as each will receive the opportunity to rely upon their previously submitted claim from to the Receiver, or submit a new claim form if they are an Additional Claimant under the terms of the Settlement, and be paid a Distribution of the Net Consideration based on the amount of his or her Allowed Claim.

In sum, when taking into consideration the substantial monetary benefits to the Settlement Class, the inherent risks (and costs) of continued litigation, the stage of the proceedings at which the Settlement was reached, the effectiveness of the proposed method for distributing relief to the Settlement Class, and the proposed manner of allocating benefits to the Settlement Class: the proposed Settlement provides for a recovery for the Settlement Class that is, in all respects, fair, reasonable and adequate and in the best interests of the Settlement Class.

## V. CONCLUSION

For the reasons stated above, Plaintiffs ask this Court to enter the proposed Final Approval Order attached as **Exhibit 1** and grant final approval of the Settlement of this Action and dismiss the Action with prejudice, as well as any other or further relief the Court deems necessary or proper.[4] Plaintiffs further request that the Court grant Plaintiffs' Motion for Award of Attorneys' Fees [D.E. 70].

Dated: May 31, 2023.

Respectfully submitted,

| | |
|---|---|
| **LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP** <br> 201 South Biscayne Boulevard <br> Miami Center, 22nd Floor <br> Miami, FL 33131 <br> Telephone: 305-403-8788 <br><br> By: */s/ Jason Kellogg* <br> Jeffrey C. Schneider, P.A. <br> Florida Bar No. 933244 <br> Email: jcs@lklsg.com <br> Jason K. Kellogg, P.A. <br> Florida Bar No. 0578401 | **COLSON HICKS EIDSON, P.A.** <br> 255 Alhambra Circle Suite, Penthouse <br> Coral Gables, Florida 33134 <br> Telephone: (305) 476-7400 <br><br> By: /s/ Curtis B. Miner <br> Curtis B. Miner, Esq. <br> Fla. Bar No. 885681 <br> Email: curt@colson.com <br><br> **MADERAL BYRNE & FURST PLLC** <br> 2800 Ponce de Leon, Ste. #1100 <br> Telephone: (305) 520-5690 <br><br> By: /s/ Francisco R. Maderal <br> Francisco R. Maderal <br> Fla. Bar. No. 305596 <br> Email: frank@colson.com |

*Lead Class Counsel for Plaintiffs*

---

[4] The Final Approval Order has been revised to omit the paragraph referring to the granting of Service Awards for the Class Representatives (former ¶ 31), and to fill in blanks relating to the attorneys' fee request (name of Plaintiffs' fee expert, the dollar amounts requested, and the % of the Settlement Fund) (¶ 29).

**SONN LAW GROUP**
Jeffrey R. Sonn
19495 Biscayne Blvd., Suite 607
Aventura, Florida 33180-2320
Telephone: (305) 912-3000

**SILVER LAW GROUP**
Scott L. Silver
Ryan A. Schwamm
11780 W Sample Road
Coral Springs, Florida 33065
Telephone: (954) 755-4799

**SALLAH ASTARITA & COX, LLC**
James D. Sallah
Jeffrey L. Cox
3010 N. Military Trail, Ste. 210
Boca Raton, FL 33431
Telephone: (561) 989-9080

*Counsel for Plaintiffs*